**Jesus DAULO, Plaintiff,**

v.

**COMMONWEALTH EDISON, Phillip Stachelski, and Donald Cook, Defendants.**

**No. 94 C 6980.**

United States District Court, N.D. Illinois, Eastern Division.

Sept. 11, 1996.

Jill A. Friedman, Michael J. Zarski, Edward Ted Stein, Law Offices of Edward T. Stein, Chicago, IL, Mary Lou Boelcke, Chicago, IL, for plaintiff.

Jesus S. Daulo, Kenosha, WI, pro se.

Arthur B. Smith, Jr., Robert Patrick Casey, Tracey Lynne Truesdale, Murphy, Smith & Polk, Chicago, IL, Glenn Douglas Newman, Carolyn K. Winick, Commonwealth Edison Company, Chicago, IL, for Commonwealth Edison, Donald Cook.

Donald C. Clark, Jr., Stephen A. Kolodziej, Clark & DeGrand, Chicago, IL, for Philip Stachelski.

---

**MEMORANDUM OPINION AND ORDER**

ALESIA, District Judge.

This matter is before the Court on Defendants Commonwealth Edison and Donald Cook's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, Defendant Phillip Stachelski's motion to dismiss one count of the amended complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b), and Defendants' motion to strike. For the reasons set forth below, the motion for summary judgment and the motion to dismiss are allowed; the motion to strike is denied.

## I. BACKGROUND

### A. Facts

Plaintiff Jesus Daulo is a male of Filipino descent. Daulo was employed by Defendant Commonwealth Edison (ComEd) at its Zion Nuclear Generating Station (Zion Station) in Zion, Illinois. Daulo began his employment with ComEd in 1978 as a "Station Man" in the Operating Department at the Zion Station. Daulo held that job until 1980. From March 1980 to September 1980, Daulo was a "Helper" in the Mechanical Maintenance Department. Beginning in September 1980, Daulo advanced to a "B Mechanic" in that department. In May 1983, Daulo was promoted to an "A Mechanic."[1] Daulo remained in that position for the remainder of his employment at ComEd. Incidentally, the mechanics are represented for collective bargaining purposes by the International Brotherhood of Electrical Workers (the Union).

Defendant Phillip Stachelski is the Supervisor—the lowest level of management—on the evening shift in the Mechanical Maintenance Department at Zion Station. Daulo was required to report to Stachelski.

Throughout the course of his employment on the evening shift, Stachelski ordered Daulo to fish for him during working hours in the "forebay" on Lake Michigan adjacent to Zion Station. A white employee named Joe Zurawski occasionally accompanied Daulo on his fishing expeditions—Daulo caught the fish,

---

[1]. Daulo was one step away from "Super A Mechanic," the highest position for a mechanic at the Zion Station.

Zurawski cleaned them. Daulo never complained to or informed anyone in ComEd or the Union regarding Stachelski's orders requiring him to fish.

On November 2, 1993, Stachelski ordered both Daulo and Zurawski to extend their hands with the palms down. Once their hands were in position, Stachelski slapped them in front of approximately 14 people. On a separate occasion, Stachelski again slapped the hands of Daulo. Daulo never complained to or informed anyone in ComEd or the Union about the hand-slapping incidents.

On three occasions between September 1993 and November 1993, Stachelski threatened to discipline Daulo for failing to wear safety equipment. The threatened disciplinary measures never materialized, however—Daulo was never "written up" for the safety violations. Daulo never complained to or informed anyone in ComEd or the Union about Stachelski's threats.

Stachelski also directed numerous derogatory comments at Daulo. For instance, Stachelski called Daulo a "flip," which apparently is a derogatory reference to his Filipino heritage. On several occasions, Stachelski told Daulo that he had just "finished reading his obituary." Daulo interpreted that comment as a reference to his personnel file, which would contain any disciplinary records, performance records, or any other documents reflecting negatively on Daulo. Additionally, Stachelski told Daulo on more than one occasion: that he wanted to make him sweat for his money; not to commit suicide if he (Stachelski) was on duty; that he was being monitored; and that he (Stachelski) could get him fired because he had the power from downtown. With the exception of the "obituary" comment, Daulo never informed anyone from ComEd or the Union about the comments.

Unfortunately, Daulo's performance was not always up to par.

In March 1991, Daulo received a one-day suspension without pay for deliberately crossing a radiation protection barrier.

The year 1993 was a particularly bad year for Daulo. In February 1993, Daulo, as lead mechanic, constructed a scaffold of inferior materials and lacking in many respects over an open hole 25 feet deep. The scaffold lacked kick boards and handrails, had three holes in the floor, and was secured to a piece of electrical conduit. Needless to say, the scaffold failed to comply with OSHA standards and ComEd specifications. A meeting was held between Daulo, the Union steward, a General Supervisor, and Defendant Donald Cook—the "Master Mechanic"[2]—to discuss the improperly constructed scaffold. Cook counseled Daulo about the problem and provided him with written materials on scaffold building to review.

In June 1993, Daulo was lead mechanic on an assignment to remove a "manway" cover from a single tank located on the 542 elevation of the auxiliary building. Instead of going to the 542 elevation, however, Daulo went to the 560 elevation. Once there, he opened two tanks. Daulo wrote on his work package that he worked on one tank on the 542 elevation. Subsequently, a meeting was held between Daulo, Cook, and two Union stewards. Cook informed Daulo of the problem of working on equipment that is not "out-of-service." Cook also discussed Daulo's prior performance errors, including the March 1991 suspension and the February 1993 scaffold incident. Cook explained that if Daulo continued to make such errors, disciplinary action would ensue.

Finally, in November 1993, Daulo, as lead mechanic, was assigned to replace valve bonnet gaskets on two check valves which were part of a pumping system. Daulo worked on flanges instead of check valves. Once again, Cook counseled Daulo regarding the incident.

Following the November 1993 incident, Cook determined that there were serious deficiencies in Daulo's work. Cook consulted with ComEd's Human Resource personnel to discuss possible courses of action. Cook was informed that he had grounds to terminate or demote Daulo. Instead of termination or demotion, however, Cook and the Union agreed that they would prefer to retrain Daulo. As part of the retraining process,

---

**2.** The "Master Mechanic" is a management position.

Daulo was transferred from the evening shift to the day shift. There were more "Super A Mechanics" on the day shift who were available to provide training and guidance to lower ranked mechanics.

Cook, the Union, and Daulo met to discuss the determined course of action. Cook informed Daulo that he would be transferred to the day shift and retrained. Daulo indicated that he would like to receive additional training in relief valves, motor operated valves, scaffold building, crane operations, micrometer usage, and self-checking. Daulo was scheduled to attend training in September 1994.

In February 1994, Daulo filed a charge of racial discrimination against ComEd with the Equal Employment Opportunity Commission. Daulo has been on medical disability leave as a result of major depression and a paranoid delusional disorder since July 1994.

### B. *Judicial Proceedings*

On November 11, 1994, Daulo filed a complaint in this Court. The complaint was amended on March 31, 1995. The amended complaint was brought against ComEd, Stachelski, Donald Cook, Thomas Cook, and Anthony Broccolo. The five-count complaint alleged against all five defendants: (1) racial discrimination in violation of 42 U.S.C. § 1981; (2) retaliation in violation of § 1981; (3) racial discrimination in violation of Title VII, 42 U.S.C. § 2000e, *et seq.;* (4) retaliation in violation of Title VII; and (5) intentional infliction of emotional distress in violation of Illinois state law.

In July 1995, this Court concluded that Daulo's complaint failed to state any causes of action against Thomas Cook or Broccolo; thus, they were dismissed from this matter. *Daulo v. Commonwealth Edison Co.,* 892 F.Supp. 1088 (N.D.Ill.1995). Count IV (retaliation in violation of Title VII) was also dismissed. *Id.* As to the remaining three defendants, count III (racial discrimination in violation of Title VII) was dismissed with respect to Stachelski and Donald Cook, but remained against ComEd. *Id.; see Williams v. Banning,* 72 F.3d 552 (7th Cir.1995) (only

the employer can be sued under Title VII). Finally, Daulo recently voluntarily dismissed count II (retaliation in violation of § 1981).

## II. *DISCUSSION*

This matter is now before the Court on Defendants ComEd and Cook's motion for summary judgment on counts I (racial discrimination in violation of § 1981), III (racial discrimination in violation of Title VII), and V (intentional infliction of emotional distress in violation of Illinois state law). This matter is also before the Court on Defendant Stachelski's motion to dismiss count V (intentional infliction of emotional distress) for lack of jurisdiction and Defendants' motion to strike.

Following a brief discussion regarding the motion to strike and a statement of the standard of review applicable to summary judgment motions, the Court will analyze the Title VII claim against ComEd first, then the § 1981 claim against ComEd, Cook, and Stachelski and finally the intentional infliction of emotional distress claim against ComEd, Cook, and Stachelski.[3]

### A. *Motion to Strike*

Local General Rule 12(M)(3) mandates the party seeking summary judgment to file a "statement of material facts" as to which there is no dispute. The Rule 12(M)(3) statement is to consist of short numbered paragraphs with citation to the appropriate part of the record which supports the movant's assertion that the fact is undisputed. The opposing party must then file a Rule 12(N)(3)(a) response which addresses in numbered paragraphs each of the movant's numbered factual assertions. The opposing party will either agree or disagree with each of the movant's stated undisputed facts. If the opposing party disagrees, he must cite to record evidence which supports his assertion that the fact is disputed. The opposing party may also file, if necessary, a Rule 12(N)(3)(b) statement of additional facts in a manner similar to the movant's Rule 12(M)(3) statement of facts.

---

**3.** The Court notes that Daulo's brief is unartfully    drafted and less than a model of clarity.

It's a simple rule. It doesn't ask for much from the parties. And, the language of the Local Rule 12 is neither cryptic, ambiguous, nor obscure; in fact, it is rather straightforward. The procedures called for in Rule 12 are necessary to streamline the summary judgment process. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918 (7th Cir. 1994). It goes without saying that adherence to the rule saves the Court a considerable amount of time. Additionally, the rule "forces" the parties to focus on the material facts and pertinent issues and thus, likely aids in their case preparation in the event a trial is necessary.

Unfortunately, Daulo's counsel was unable to comprehend the elementary language of Rule 12. When responding to Defendant's Rule 12(M)(3) statement of material facts, he agreed or disagreed with the stated fact and then, in numerous instances, proceeded to raise additional factual assertions—factual assertions that went well beyond the required Rule 12(N)(3)(a) "concise" response. The *additional* factual assertions raised by Daulo's counsel should have been listed in his Rule 12(N)(3)(b) statement of *additional* facts—that's why it's called a statement of *additional* facts.

■ Daulo's failure to comply with the rule caused the Court—and Defendants—to expend an exorbitant amount of time analyzing the issues. Both Defendants and Daulo were required to file additional and amended pleadings; and, more importantly, the Court was required to sort through the garbled mess. In fairness to Daulo, however, the Court will not strike his Rule 12(N)(3) response—although it could justifiably do so[4]—due to his counsel's error. Instead, the Court will determine if the additional facts listed in Daulo's Rule 12(N)(3)(a) response are supported by the evidence and go from there.

■ That, takes the Court to another issue. In many of Daulo's responses, he objects to affidavit testimony submitted by Defendants on the ground that the testimony is not supported by documentary evidence. Daulo cites no authority in support of the objection. Nor is the Court aware of any such authority that requires the affiant to support testimony within his personal knowledge with documentary evidence—keep in mind, the affidavit testimony at issue is not referring to documents, records, or papers. Indeed, the objection conflicts with FED. R.CIV.P. 56(e). Thus, the objection is invalid and the particular facts will be deemed admitted.

One final matter needs to be addressed. In numerous instances, Daulo states a "fact," but the cited evidentiary material comes nowhere near to supporting the stated factual assertion.[5] Daulo's attempt to mislead the Court is disturbing.

Now, to the merits.

## B. *Summary Judgment—Legal Standard*

Under FED.R.CIV.P. 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir.1985). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there

---

4. *See Waldridge*, 24 F.3d at 922 ("We have also repeatedly upheld the strict enforcement of" the local rules.).

5. The Court will highlight many of these instances in this Memorandum Opinion and Order.

is a genuine issue for trial. *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987).

### C. The Claims

#### 1. Title VII

■ Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" race. 42 U.S.C. § 2000e–2(a)(1). Daulo brings two independent claims for relief under Title VII against ComEd: first, he argues that he was the victim of disparate treatment based on race when ComEd decided to retrain and transfer him to the day shift; second, he argues that Defendants' discriminatory conduct created a racially hostile working environment.[6]

Each Title VII claim will be discussed in turn.

##### a. Disparate Treatment[7]

Daulo presents no direct evidence of intentional discriminatory conduct,[8] thus, the disparate treatment claim will be analyzed under the three-step model enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, Daulo must establish a *prima facie* case. He must show: (1) that he belongs to a protected group; (2) that he performed satisfactorily; (3) that he was subjected to an adverse employment action; and (4) that similarly situated employees outside the clas-

sification received more favorable treatment. *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir.1994).

Once established, the "prima facie case creates a rebuttable presumption of discrimination, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its allegedly biased employment decision." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir.1996). "If the employer meets its burden of production, the presumption dissolves." *Id.*

■ If the presumption dissolves, "[t]o prevail, the employee then must demonstrate that the nondiscriminatory explanation of the employer is pretextual." *Id.* Pretext means a lie. *Id.* There are three ways to show that a proffered nondiscriminatory explanation is pretextual: (1) the employer's explanation had no basis in fact; (2) the explanation was not the "real" reason; or (3) the reason stated was insufficient to warrant the adverse employment action. *Id.* "In trying to establish that an employer's explanation is pretextual, an employee must 'focus on the specific reasons advanced by the defendant[s].'" *Id.*

■ Daulo's argument of disparate treatment based on racial discrimination focuses on ComEd's decision to retrain and subsequently transfer him from the evening shift to the day shift.[9] Daulo is Filipino, thus he

---

6. Title VII clearly considers the asserted claims as separate causes of action to be analyzed independently. *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 937–38 (7th Cir.1996) ("This court repeatedly has recognized that racial harassment is an independent basis for a Title VII claim.").

7. As noted in the "background" portion of this order, Daulo testified to numerous instances of improper treatment, such as orders requiring him to fish, hand-slapping incidents, and derogatory comments directed towards him. Daulo, however, does not argue that any of those incidents—considered separately or in combination—qualify as an instance of disparate treatment such that it should be analyzed separately under the *McDonnell Douglas* test. Instead, Daulo is content with arguing that the sole adverse employment action to be analyzed under the *McDonnell Douglas* test is ComEd's decision to retrain and transfer him.

8. On the first page of Daulo's brief, he indicates that he has direct evidence to support his disparate treatment claim. Daulo, however, never attempts to identify any of the alleged direct evidence. He does state that he was called a "flip." But, Daulo makes no attempt to link Stachelski's remark to ComEd's employment decision. *Fuka v. Thomson Consumer Elec.*; 82 F.3d 1397, 1403 (7th Cir.1996) (To "qualify as direct evidence of discrimination, the plaintiff must show that the remarks 'were related to the employment decision in question.'"). In fact, Daulo does not even mention the remark when discussing the disparate treatment claim.

9. The Court will analyze ComEd's decision to retrain and transfer Daulo as one employment action, instead of separate, independent employment decisions. Because the "two" decisions are so closely intertwined, the Court believes that this is the proper analysis. *See Williams v. Bris-*

belongs to a protected class—the first element of his *prima facie* case is not disputed. The second element of the *prima facie* case is intertwined with ComEd's proffered legitimate, nondiscriminatory reason for the retraining and transfer decision, thus, the Court will presume for now that Daulo satisfied the second element—that he performed up to ComEd's legitimate expectations. The Court will also presume that Daulo satisfied the fourth element—that similarly situated employees outside the classification received more favorable treatment. This element is also intertwined with ComEd's proffered reason for the employment action.

■ Regarding whether Daulo was subjected to an adverse employment decision— the third element of his *prima facie* case—it is undisputed that when transferred to the day shift, Daulo's rate of pay, benefits, job classification, and type of work did *not* change, *i.e.*, the pay, benefits, job classification, and assigned work were consistent with that of an "A Mechanic." [10] Thus, Daulo was subjected to nothing more than a transfer to a different shift—everything else remained the same.[11] Can that qualify as an adverse employment action?

■ Although "adverse employment action has been defined quote broadly in this circuit," *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996), the Seventh Circuit has noted eagerly that "not everything that makes an employee unhappy is an actionable adverse action." *Id.* Indeed, minor and trivial employment actions, *see id.*, and em-

ployment actions that merely inconvenience the employee, *see Johnson*, 91 F.3d at 932–33, are not actionable. Instead, the action must materially affect the employment conditions. *Id.* Thus, perhaps the question is more accurately phrased as: is a transfer from the evening shift to the day shift a minor, trivial employment action that merely inconveniences the employee, or, is it a material change in working conditions?

If the transfer was *permanent* and the employee had spent a considerable amount of time working on the pre-transfer shift—Daulo claims that he spent 14 years on the evening shift—the Court is inclined to hold that the transfer to a different shift—even though pay, benefits, and job responsibility remained constant—qualifies as an actionable adverse employment action. A transfer to another shift, after spending years on a different shift, could be very disruptive to one's working conditions. *See Khan v. Cook County*, No. 96 C 1113, WL 432410 *2 (N.D.Ill. July 30, 1996) ("Transfer to the night shift can be more than a minor change in working conditions.").

The Court's discussion presumed that Daulo's transfer to the day shift was permanent. Defendants, however, submit the affidavit testimony of Cook and Human Resource Associate Lorilyn Aquino, and the deposition testimony of Daulo in support of their assertion that the transfer was only temporary—it was necessary only until Daulo was retrained.[12] Daulo disputes Defendants' assertion, but offers no evidence to rebut their

tol–Myers Squibb Co., 85 F.3d 270 (7th Cir.1996) (Apparently analyzing a transfer and assignment to a coaching program as one employment decision). Daulo offers no argument that the decisions should be considered independently.

10. In Daulo's brief, he states that the transfer was a "demotion" because he was assigned the work of a "Helper"—the lowest mechanic's position at Zion Station. If true, the diminished responsibilities could likely qualify as an adverse employment action. *See Crady v. Liberty Nat'l Bank and Trust Co. of Ind.*, 993 F.2d 132 (7th Cir.1993). Daulo, however, cites no evidence in support of that statement. Indeed, the evidence that Daulo cites lends no support to his position. Furthermore, in response to Defendants' Rule 12(M)(3) statement, Daulo concedes that he was assigned the work of an "A Mechanic."

11. As noted, Daulo was also ordered to undergo retraining. The Court expresses great doubt as to whether a *temporary* retraining program can qualify as an adverse employment action. *See Williams*, 85 F.3d at 274–75 ("So the claim on the transfer and the coaching program goes nowhere."). Daulo argues that if he would have failed any of the training modules, he would have been demoted. He fails, however, to cite any evidence in support of that assertion. Furthermore, Daulo never attended the retraining program—due to his medical disability leave—thus, whether he would have failed and been demoted is nothing more than speculation.

12. Daulo testified that Cook told him that he would be transferred to the day shift pending training school. Daulo Dep. pg. 426.

characterization of Daulo's transfer as temporary.[13] Accordingly, the Court finds that the transfer was temporary. Based on that finding, as alluded to above, the Court does not believe that a temporary shift transfer combined with a temporary retraining program—and nothing more—qualifies as an adverse employment action. *See Davis v. State of Cal. Dep't of Corrections*, No. S–93–1307, WL 271001 *6 (E.D.Cal. Feb. 23, 1996) ("[T]emporary actions will not be adverse under Title VII if employees retain the same pay and rank and the new position is not less desirable to an objective observer.").

■ Regardless, the Court will presume that Daulo suffered an adverse employment action and thus, based on the Court's other presumptions, established a *prima facie* case of racial discrimination. ComEd must now rebut the presumption of racial discrimination by offering a legitimate, nondiscriminatory reason for ordering Daulo to undergo retraining and subsequently transferring him to the day shift. ComEd does that: it claims that it ordered Daulo to undergo retraining—instead of firing or demoting him—because of his recent poor performance and transferred him to the day shift as a consequence of its retraining decision.

To review, Daulo made three errors in 1993. After the third error, Cook determined that there were serious deficiencies in Daulo's work. Cook consulted with ComEd's Human Resource Department and was informed that sufficient grounds existed to terminate or demote Daulo. Instead, of termination or demotion, however, Cook elected to retrain Daulo. As part of that course of action, Daulo was transferred to the day shift where there were more "Super A Mechanics" to supervise and provide guidance to the lower ranked mechanics—Daulo was only an "A Mechanic."

■ ComEd has offered a legitimate, nondiscriminatory reason supporting Daulo's retraining and transfer to the day shift. Daulo must now show that the proffered explanation is pretextual, *i.e.,* a lie. Keep in mind, Daulo must *"specifically* refute the facts which allegedly support the employer's proffered reasons." *Mills v. First Federal Sav. & Loan Ass'n,* 83 F.3d 833, 845 (7th Cir.1996).

Daulo concedes that he made three errors in 1993, he concedes that ComEd could have terminated or demoted instead of retraining him, he concedes that there are more "Super A Mechanics" on the day shift, he concedes that the "Super A Mechanics" provide training and guidance to lower ranked mechanics,[14] and he concedes that he identified several areas where he believed that he would benefit from additional training, *see Smart,* 89 F.3d at 442 n. 2 ("Perhaps the most telling indication of their honesty is a memo prepared by Vidian herself, which identifies areas where she felt she needed improvement."). Thus, based on Daulo's concessions, of the three ways discussed previously to show that a nondiscriminatory reason is pretextual, apparently Daulo agrees that he cannot rely on reason number one (the explanation had no basis in fact) or reason number three (the stated explanation was insufficient to warrant the employment decision). Instead, Daulo asserts that his errors were not the "real" reason (reason number two) why he was assigned to retraining and subsequently transferred to the day shift. He contends, of course, that his race was the "real" reason for the decision.

■ In his attempt to establish that ComEd's proffered reason is a lie, Daulo first argues that other employees committed "worse" errors and were not treated as se-

---

**13.** In support of his attempt to rebut Defendants' claim that the transfer was temporary, Daulo cites, in his response to Defendants' Rule 12(M)(3) statement, page 435 of his deposition. Page 435 has nothing to do with the instant issue. In his amended response, Daulo cites to page 283 of his deposition. Daulo, however, failed to attach that page to any of his submissions.

**14.** In Daulo's response to Defendants' Rule 12(M)(3) statement, he denies that "Super A Mechanics" provide training to lower ranked mechanics. He cites no evidence in support of the denial, however. In Daulo's deposition, he responded affirmatively to a question inquiring as to whether "Super A Mechanics" train other mechanics. Daulo Dep. pg. 425. Another example of Daulo's "inconsistencies" in defending against the motion for summary judgment.

verely. In support of his argument, Daulo cites two factual statements (¶'s 73 and 75) in Defendants' Rule 12(M)(3) statement and two factual statements (¶'s 116 and 117) in his Rule 12(N)(3)(b) statement of additional facts.

The two statements in Defendants' Rule 12(M)(3) statement respectively identify an error made by "A Mechanic" Richard Stephenson and "A Mechanic" Larry Williams. In both instances, a "Problem Identification Form (PIF)" was drafted to document the error. The Court fails to understand how the circumstances surrounding the two errors support Daulo's position that ComEd's proffered reason is pretextual. The cited statements involve a *single* error by each of two mechanics. Daulo, on the other hand, committed three errors in less than a year.

The first cited factual statement from Daulo's Rule 12(N)(3)(b) statement of additional facts notes that over 50 PIFs were generated at Zion Station during the period of 1992 to 1994. Daulo, however, fails to provide any pertinent information regarding the PIFs, such as the identities of the mechanics who were involved in the errors underlying the PIFs. Thus, once again, the Court fails to understand how a citation to such a fact supports Daulo's position that ComEd's explanation is pretextual. The next cited factual statement notes that between 1992 and 1994 no mechanic was ordered to undergo retraining and transferred to the day shift as a consequence of his errors. Like the prior statement, however, Daulo fails to identify the errors or the identities of the particular mechanics. Thus, how can the Court determine if another mechanic was in a situation similar to Daulo, but was treated differently?

In a final attempt to show pretext on the part of ComEd, Daulo argues that the errors of other mechanics were either never reported or handled informally. Regarding the "informal" handling of errors, the factual statement (¶ 68) Daulo cites in support does not even concern the issue. Regarding the failure to record the errors of other mechanics, Daulo cites to his deposition testimony discussing an incident where two mechanics failed to properly perform a job. When asked whether their errors were document-

ed, Daulo stated: "As far as I know, its not documented ... If it was, I don't remember and I didn't see it." When asked whether a PIF was drafted, Daulo noted that he inquired but could not locate one. By Daulo's own admission, he does not know if the incident was documented. Moreover, the Court fails to see the relevance of drafting a PIF when, with at least one, if not all, of Daulo's errors, there was no PIF drafted.

In summary, the Court does not believe that Daulo has come forward with enough evidence to cast doubt on the truthfulness of ComEd's explanation as to why Daulo was ordered to undergo retraining and subsequently transferred to the day shift. Accordingly, assuming Daulo established a *prima facie* case, he failed to come forward with enough evidence to support the inference that ComEd's proffered reason regarding its retraining and transfer decision is pretextual.

#### b. *Hostile Working Environment*

Daulo also claims that he was subjected to a hostile working environment as a result of Defendants' continuous harassment motivated by racial animosity. Generally, whether a hostile environment exists depends on whether the "quantity, frequency, and severity of the racial, ethnic, or sexist slurs create a work environment so hostile as to discriminate against the minority employee." *Vore v. Ind. Bell Tel. Co., Inc.*, 32 F.3d 1161, 1164 (7th Cir.1994). In other words, the harassment "must be sufficiently severe or pervasive so as to alter the conditions of the victim's employment and to create an abusive working atmosphere." *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 479–80 (7th Cir.1996). The inquiry into whether the environment was sufficiently hostile or discriminatory involves a dual standard—an objective and subjective standard. *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1271–72 (7th Cir.1991) (quoting *Brooms v. Regal Tube Co.*, 881 F.2d 412, 419 (7th Cir.1989)). The objective standard focuses on the environment's effect on a reasonable person; the subjective standard focuses on the environment's actual effect on the particular employee. *Id.* at 1272.

In his brief, although Daulo alleges that "Defendants" harassed him, he bases the racially hostile working environment claim *exclusively* on the conduct of Stachelski.[15] Specifically, Daulo claims that the cumulative effect of Stachelski's orders requiring him to fish and constant mistreatment, such as slapping his hands and numerous derogatory comments, created a hostile working environment motivated by racial animosity. ComEd apparently concedes—for purposes of summary judgment—that Stachelski's conduct qualifies as racial harassment sufficiently severe and pervasive to create a hostile environment. ComEd, instead, seeks summary judgment on the ground that it cannot be held liable for Stachelski's conduct.[16]

In arguing that it cannot be liable for Stachelski's conduct, ComEd states that it neither knew nor had reason to know of his misconduct. *See Saxton v. AT & T Co.,* 10 F.3d 526, 535 (7th Cir.1993) ("[T]he employer ... is liable for [the] employee's torts against a coworker only if, knowing or having reason to know of the misconduct. . . .") (quoting *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 465 (7th Cir.1990)). Daulo disagrees with ComEd's standard for determining its liability. Daulo argues that ComEd's knowledge of Stachelski's improper conduct is irrelevant. Because Stachelski was a supervisor, *i.e.,* a part of ComEd's management team, Daulo argues that Stachelski essentially was ComEd—the employer. Since Stachelski was ComEd, Daulo argues agency law must be consulted to determine whether his acts constitute the acts of ComEd. Specifically, as long as the harassment was within the scope of Stachelski's employment or within his apparent authority, ComEd is liable. Alternatively, Daulo argues that ComEd was aware of Stachelski's conduct.

As explained below, based on the facts of this case, the Court concludes that Stachelski should not be treated as ComEd—Daulo's

employer. Thus, the applicable standard to determine ComEd's liability is whether it knew or had reason to know of Stachelski's conduct and failed to act accordingly. And, because the answer to that inquiry is no, ComEd is not liable for Stachelski's conduct. Alternatively, as also explained below, even if the Court resorts to agency principles and asks whether the racial harassment was within the scope of Stachelski's employment or apparent authority, the Court expresses doubt as to whether Daulo could withstand summary judgment.

As noted recently by a couple of district courts in this district, the law of the Seventh Circuit as to when a supervisor can be considered the employer—and hence bind the employer for the supervisor's discriminatory conduct—is anything but clear. *Ellerth v. Burlington Indus., Inc.,* 912 F.Supp. 1101, 1116 (N.D.Ill.1996); *Jansen v. Packaging Corp. of Am.,* 895 F.Supp. 1053, 1060–61 (N.D.Ill.1995). Occasionally, the Seventh Circuit notes that agency principles are to be consulted, *see, e.g., Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 445 (7th Cir.1994) ("Whether sexual harassment by a supervisor can be imputed to the employer corporation is governed by principles of agency."); *North v. Madison Area Ass'n for Retarded Citizens,* 844 F.2d 401, 407 (7th Cir.1988), but, the opinions fail to elaborate or provide anything more than basic, general guidance on the issue. Thus, although it appears clear that agency principles will come into play, the particulars of when these principles come into play and how the courts are to apply them is certainly unclear.

Nevertheless, the Court believes that Chief Judge Posner's lead—or, at least, one interpretation of his lead—in *Hunter v. Allis-Chalmers Corp.,* 797 F.2d 1417 (7th Cir. 1986), provides the proper starting point. As discussed in *Hunter,* a corporation—the employer—acts only through the actions of human beings. *Id.* at 1422. Thus, to say that a

---

**15.** At some point in this litigation, it appears that Daulo claimed that the conduct of other ComEd employees contributed to the racially hostile working environment. At the summary judgment stage, however, he apparently abandoned that theory. As noted, his brief cites only to the conduct of Stachelski.

**16.** Keep in mind, under Title VII, the plaintiff can recover only against the employer, not the supervisors or other employees. *Williams v. Banning,* 72 F.3d 552 (7th Cir.1995).

corporation has committed a wrong, means that someone at the "decision-making level in the corporate hierarchy" has committed the wrong. *Id.* In other words, "the deliberate act of such a person is the corporation's deliberate act." *Id.*

■ The Court interprets *Hunter's* brief discussion of corporate liability to mean that merely because one is a supervisor or technically part of the employer's management team does not mean that his actions may be construed as the corporation's actions for purposes of imposing Title VII liability. Rather, to impute the supervisor's conduct to the employer—and effectively treat the supervisor as the employer—the supervisor *first* must be sufficiently "high up" in the corporate hierarchy to be considered a part of its "decision-making level." If the supervisor or management person is part of the employer's "decision-making level," he will be considered the corporation's *agent* for Title VII liability purposes. Only then should the court resort to agency principles—scope of employment, apparent authority, etc.—to determine if the supervisor's discriminatory conduct should be considered the employer's discriminatory conduct.

The Court finds support for its analysis in *Saxton v. AT & T Co.,* 10 F.3d 526 (7th Cir.1993). In that case, the harasser was one of AT & T's low-level supervisors. Citing *Hunter,* the Seventh Circuit noted that if "someone in the employer's *decision-making hierarchy* engages in harassment, the employer may be held liable regardless of whether it could reasonably have foreseen or prevented the misconduct, for in that instance, the acts of the managerial employee constitute the acts of the employer." *Id.* at 536 n. 19 (emphasis added). Although the harasser was the plaintiff's supervisor, the record did "not suggest that he was so *highly placed in AT & T's hierarchy as to be considered the company's agent.*" *Id.* (emphasis added). Thus, consistent with the Court's interpretation of Judge Posner's remarks in *Hunter,* it appears that a managerial employee cannot be considered an agent—and po-

tentially the employer—for purposes of imposing Title VII liability upon the employer corporation unless he *first* is part of the corporation's "decision-making level."

■ The next question, of course, is what does it mean to be part of the corporation's "decision-making level?" At a minimum, the Court believes that the supervisor or management person must have *significant* control or input over the corporation's hiring, firing, promotional, or disciplinary decisions. *See Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir.1993) ("We agree with the Fourth Circuit that '[a]n individual qualifies as an 'employer' under Title VII if he or she serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing, or conditions of employment.' "); *Harvey v. Blake,* 913 F.2d 226, 227 (5th Cir.1990) ("[I]mmediate supervisors are Employers when delegated the employer's traditional rights, such as hiring and firing.").

■ Accordingly, applying the preceding analysis to the facts of the instant case, the first inquiry is whether Stachelski can qualify as an agent of ComEd. Specifically, was Stachelski part of ComEd's "decision-making level," or, even more specifically, did Stachelski possess *significant control* over ComEd's hiring, firing, promotional, or disciplinary decisions? Based on the Court's review of the record, it appears that Stachelski was nothing more than the lowest cog in ComEd's managerial machine. Stachelski was the lowest level supervisor in ComEd's four-tier supervisor system. He did not have the authority to hire, fire, demote, or promote anyone. True, he had the authority to make recommendations regarding such decisions and the power to issue "informal warnings," but, such actions are inherently part of virtually every supervisor's responsibilities.[17] Thus, the Court concludes that Stachelski was as low as one could get in ComEd's managerial system and, consequently, cannot qualify as an agent of ComEd for purposes of imposing Title VII liability.

---

17. Daulo attempts to make Stachelski's authority appear much greater, but his cites to the record do not support his contentions.

Even assuming that Stachelski could qualify as an agent, however, Daulo still has an uphill battle to fight in his attempt to impute Stachelski's racial harassment to ComEd. To review, applying agency principles, Daulo argues that ComEd should be liable for Stachelski's conduct under one of two theories: first, Stachelski acted within the scope of his employment; and/or second, Stachelski acted within the scope of his apparent authority.

Regarding the scope of employment argument, several courts have either expressed great doubt as to whether harassment could fall within the scope of a supervisor's employment, *see, e.g., Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir.1990) ("From the outside, at least, it looks as if he is doing his job, which is not the case when one worker sexually harasses another...."); *Hunter,* 797 F.2d at 1422 ("It would be the rare case where racial harassment against a co-worker could be thought by the author of the harassment to help the employer's business."); *Faragher v. City of Boca Raton,* 76 F.3d 1155, 1164 (11th Cir.1996) ("[O]nly in an exceptional case will a harasser act as the employer's agent in creating a hostile work environment."), *en banc reh'g granted, decision vacated,* 83 F.3d 1346 (11th Cir.1996), or concluded that such harassing conduct, by its very nature, is *not* within the scope of employment, *see, e.g., Andrade v. Mayfair Management, Inc.,* 88 F.3d 258, 261 (4th Cir.1996) ("Our precedent rests on the presumption that illegal sexual harassment is an illegitimate corporate activity, beyond the scope of supervisors' employment."); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1417–18 (10th Cir.1987) ("Sexual harassment simply is not within the job description of any supervisor or any other worker in any reputable business."); *Jansen v. Packaging Corp. of Am.,* 895 F.Supp. 1053, 1061 n. 9 (N.D.Ill. 1995) ("Was sexual harassment within the scope of [the supervisor's] employment? Of course not.").

Nevertheless, some courts have noted that if the harasser's conduct was motivated, at least in part, by an intent to serve or further the employer's business, the harassment could fall within the supervisor's scope of employment. *See Faragher,* 76 F.3d at 1164, n. 9; *Ellerth,* 912 F.Supp. at 1116–17; *Fields v. Horizon House, Inc.,* No. 86–4343, 1987 WL 26652 *3 (E.D.Pa. Dec. 9, 1987). Under this line of reasoning, because many of Stachelski's alleged racially derogatory comments berated Daulo's work performance, the conduct could be found to be sufficiently linked to a motive to serve ComEd, *i.e.,* the motivation for discriminating against Daulo based on his race overlapped with a motivation to improve his performance and thus benefit ComEd. Thus, if the Seventh Circuit accepts such reasoning, assuming Stachelski could qualify as an agent of ComEd, the racial harassment arguably was within the scope of his employment.

■■■ Although Daulo's scope of employment argument could have some merit to it, it appears that his apparent authority argument is a loser. The vast majority of courts to consider this particular issue hold that if the employee knew or should have known that the employer did not tolerate the harassing conduct and that he could report it without fear of adverse consequences, the apparent authority argument is doomed. *See, e.g., Gary v. Long,* 59 F.3d 1391, 1398 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995); *Bouton v. BMW of North Am., Inc.,* 29 F.3d 103, 109–10 (3d Cir.1994); *Ripberger v. Western Ohio Pizza, Inc.,* 908 F.Supp. 614, 622–24 (S.D.Ind.1995); *Jansen,* 895 F.Supp. at 1066–67.

Here, although Daulo failed to complain to anyone about the bulk of Stachelski's conduct, he eventually went to Cook after Stachelski told him that he "just finished reading his obituary." Thus, obviously, Daulo knew that Stachelski's behavior was inappropriate and that he had recourse within ComEd's upper management. Accordingly, he cannot now complain that he reasonably believed Stachelski's racial harassment was within the scope of his apparent authority. *See Jansen,* 895 F.Supp. at 1067 ("But when she was pushed 'to the limit' ... she 'just walked out and went to personnel.' [Plaintiff] plainly knew that she had some recourse at Packaging, and she cannot now claim that she believed [the] conduct to be sanctioned by Packaging.").

Now, back to the relevant issue.

■ Having concluded that Stachelski is not sufficiently "high up" in ComEd's management to qualify as an agent for purposes of imposing direct liability upon ComEd, ComEd will be liable only if it knew or had reason to know of the misconduct and failed to take appropriate corrective action.[18] *Saxton*, 10 F.3d at 535 (quoting *Guess*, 913 F.2d at 465). It is undisputed that, with one exception, Daulo failed to inform anyone about Stachelski's conduct.[19] On that one occasion, Daulo notified Cook that Stachelski told him that he was "reading his obituary." Certainly, one apparently race neutral comment did not put ComEd on notice of the racially hostile working environment created by Stachelski.

Furthermore, Daulo did not inform Cook of the improper comment until February 1, 1994. Daulo was transferred to the day shift, however, on January 3, 1994. It is undisputed that Daulo was never harassed by Stachelski after he transferred to the day shift. Thus, the racially hostile working environment created by Stachelski ended on January 3, 1994. The purpose of notifying the employer of the harassment is to allow the employer to take prompt remedial action.[20] *See Williams v. Banning*, 72 F.3d 552, 555 (7th Cir.1995). Accordingly, even assuming ComEd was on notice of *all* of Stachelski's conduct as of February 1, 1994, how could it possibly take corrective action

when the racially hostile environment had ended one month earlier? Regardless, it is clear that ComEd did not know about the hostile working environment and thus cannot be liable for Stachelski's conduct.[21]

### 2. *42 U.S.C. § 1981*

■ Generally, § 1981 "addresses racial discrimination in contractual relationships." *Morris v. Office Max, Inc.*, 89 F.3d 411 (7th Cir.1996). The statute reads in pertinent part:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right to make an enforce contracts ... as is enjoyed by white citizens....

(b) "Make and enforcement contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(a) and (b).

■ "Although § 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." *Johnson*, 91 F.3d at 940. Importantly, § 1981 liability against an individual must be predicated on *personal involvement* in the discriminatory conduct, *i.e.*, there must be a link

---

**18.** Daulo makes no argument that ComEd negligently hired or supervised Stachelski, or that ComEd should have known about the conduct.

**19.** Keep in mind, the racially hostile work environment was created solely by Stachelski. Daulo's brief cites only to his conduct.

**20.** Incidentally, Cook's affidavit attests to the fact that after Daulo notified him of Stachelski's comment, Cook met with Stachelski and told Stachelski that such a comment was improper. Daulo disputes the occurrence of the meeting, but offers no evidence supporting his assertion that Cook never counseled Stachelski regarding the comment.

**21.** Daulo argues that "ComEd had notice." As usual, however, Daulo's citations to the record do not support such an assertion. As discussed, it is undisputed that Daulo was never harassed by Stachelski after he was transferred to the day

shift on January 3, 1994. Thus, the racially hostile working environment created by Stachelski ended on January 3, 1994.

Daulo's first citation to the record refers to a questionnaire filed by Daulo on January 17, 1994. The cited deposition testimony provides very little information regarding the questionnaire. Nowhere did Daulo state that Stachelski harassed him. Furthermore, the racially hostile working environment created by Stachelski had already ended at this point.

The second citation to the record refers to an occurrence in March of 1994. Once again, though, the racially hostile working environment created by Stachelski was long over at this point in time. Thus, once again, assuming ComEd was notified of Stachelski's conduct, how could ComEd be penalized for failing to take corrective actions when there was no longer any racial harassment by Stachelski to worry about?

to connect the actor with the discriminatory conduct. *Musikiwamba v. ESSI, Inc.,* 760 F.2d 740, 753 (7th Cir.1985); *Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978, 983 (10th Cir. 1991).

Consistent with the Court's foregoing analysis of Daulo's Title VII claims, Daulo's evidence supports a § 1981 harassment claim against only Stachelski. As noted, the evidence fails to provide for a Title VII claim against ComEd. Furthermore, Daulo's brief advances no argument of wrongful conduct on the part of ComEd or Cook. Thus, the sole remaining action is a racially hostile work environment claim against Stachelski—Defendants did not argue that Stachelski's conduct could not support a hostile environment claim.

### 3. *Intentional Infliction of Emotional Distress*

Count V of Daulo's amended complaint is brought against ComEd, Cook, and Stachelski for intentional infliction of emotional distress (IIED). Defendants offer four independent reasons as to why the IIED claim should not remain in this matter with respect to all or some of them. The Court will focus on two of those reasons: (1) the IIED claim is preempted by the exclusivity provision of the Illinois Human Rights Act (IHRA); and (2) the IIED claim is preempted by the exclusivity provision of the Illinois Workers' Compensation Act (IWCA).

#### a. *The IHRA*

■ The IHRA was enacted to create a state cause of action for various civil rights violations amounting to discrimination based on, among other things, race. 775 ILCS 5/1-102(A); *See Luckett v. Jett,* 966 F.2d 209, 211 (7th Cir.1992), *cert. denied,* 507 U.S. 922, 113 S.Ct. 1287, 122 L.Ed.2d 679 (1993). The IHRA has an exclusivity or preemption provision which provides: "Except as otherwise provided by law, no court of this state shall have jurisdiction over the subject' of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-111(C). Based on that provision, the Illinois Human Rights Commission (IHRC) is vested with *exclusive* jurisdiction over claims which fall under the IHRA. Thus, courts have no jurisdiction to hear actions for alleged human rights violations until administrative remedies are exhausted before the IHRC and the IHRC has issued a final order. *See Talley v. Washington Inventory Serv.,* 37 F.3d 310, 312–13 (7th Cir.1994).

■ Of course, when a particular claim qualifies as a human rights violation—such that it falls within the exclusive purview of the IHRA—and thus is preempted by the IHRA is not always clear. Recently, the Illinois Supreme Court in *Geise v. Phoenix Co. of Chicago, Inc.,* 159 Ill.2d 507, 203 Ill. Dec. 454, 639 N.E.2d 1273 (1994), had the opportunity to discuss the issue. The Court held that when state common law tort claims—namely, negligent hiring and retention of a supervisor—are "inextricably linked" to the allegations of discrimination, the claims will be construed as charging a civil rights violation under the IHRA. *Geise,* 203 Ill.Dec. at 454–55, 639 N.E.2d at 1277–78. Accordingly, such claims will be dismissed for lack of jurisdiction, assuming the plaintiff did not exhaust the administrative remedies before the IHRC—which is the common scenario.

The holding in *Geise* has been interpreted rather broadly by the judges in this district. Indeed, the courts of the Northern District of Illinois are routinely dismissing Illinois state tort claims—particularly IIED claims—for lack of jurisdiction when brought in conjunction with allegations of a civil rights violation, concluding that such claims are "inextricably linked" to the underlying discrimination claim and thus preempted by the IHRA. *See, e.g., Damato v. Jack Phelan Chevrolet Geo, Inc.,* 927 F.Supp. 283, 290–91 (N.D.Ill.1996) (Judge Norgle: battery claim dismissed); *Jansen,* 895 F.Supp. at 1068–69 (Judge Shadur: IIED claim dismissed); *Drago v. Davis,* No. 96 C 2398, 1996 WL 479696 (N.D.Ill. Aug. 20, 1996) (Judge Hart: retaliatory discharge, tortious interference with contract and prospective economic advantage, and IIED claims dismissed); *Wysong v. Wendy's Int'l, Inc.,* No. 95 C 6985, 1996 WL 450793 (N.D.Ill. Aug. 8, 1996) (Judge Gettleman: IIED and wrongful discharge claims dismissed); *Johnson v. C & L, Inc.,* No. 95 C 6381, 1996 WL 308282

(N.D.Ill. June 6, 1996) (Judge Norgle: IIED and assault and battery claims dismissed); *Stewart v. Thomas,* No. 95 C 6971, 1996 WL 308284 (N.D.Ill. June 6, 1996) (Judge Conlon: IIED claim dismissed); *Erickson v. Elco Indus., Inc.,* No. 95 C 50328, 1996 WL 268383 (N.D.Ill. May 20, 1996) (Judge Reinhard: IIED claim dismissed); *Janopoulos v. Harvey L. Walner & Assoc.,* No. 93 C 5176, 1996 WL 131754 (N.D.Ill. March 15, 1996) (Judge Coar: IIED claim dismissed). This Court will not break with the long-line of recent case law in this district and thus will analyze the preemptive effect of the IHRA consistent with such cases.[22]

When determining if the state claim—here, the IIED claim—is "inextricably linked" to the discrimination claim, the courts generally look to whether the state claim could form an independent basis for imposing liability, absent the allegations of discrimination. *See, e.g., Geise,* 203 Ill.Dec. at 458, 639 N.E.2d at 1277 ("Absent the allegations of sexual harassment, Geise would have no independent basis for imposing liability on her former employer."); *Lynam v. Foot First Podiatry Centers, P.C.,* 886 F.Supp. 1443, 1449 (N.D.Ill.1995); *Johnson,* 1996 WL 308282 at *4 ("Johnson's emotional distress and assault and battery claim turn entirely on the facts which form the basis of her sexual harassment claim.").

■ Here, by deferring to Daulo's amended complaint, the Court notes that the IIED count incorporates the factual allegations underlying the racial discrimination claim—no additional factual allegations support the claim. Thus, similar to *Geise,* absent the allegations of racial discrimination, Daulo has no independent factual basis for imposing IIED liability.

22. Daulo agrees with the analysis of the numerous judges in this district. He does not ask the court to disregard the cited cases. Rather, he claims that his IIED claim can be maintained consistent with those cases.

23. Keep in mind what Daulo, arguably, just did to his IIED claim. That is, arguably, he just limited the IIED claim to two instances of hand slapping. The other instances of improper conduct, such as the fishing orders and derogatory comments, cannot be linked to the battery.

Daulo attempts to avoid that conclusion by arguing that Stachelski's slapping of his hands on two occasions qualifies as battery. And, the battery claim exists independent of the discrimination claim; thus, the IIED claim survives since it is no longer linked to the discrimination claim, rather, it is linked to the battery claim.[23]

The Court might accept Daulo's reasoning, *see Lynam,* 886 F.Supp. at 1449, but for one big problem: there is no battery count in this action. Indeed, Daulo has not pleaded a battery cause of action against Stachelski. Thus, based on the posture of this case, the factual allegations supporting the IIED count are identical to the factual allegations supporting the discrimination claim—and no other claim is present. Accordingly the Court must conclude that the IIED claim is "inextricably linked" to the discrimination claim; thus, it is preempted by the IHRA. Since Daulo did not exhaust his administrative remedies before the IHRC, the Court lacks jurisdiction to hear the claim and therefore it must be dismissed.

#### b. *The IWCA*

■ Assuming that Daulo's IIED claim was not preempted by the IHRA, the Court would find that it is preempted by the IWCA with respect to ComEd. The IWCA provides, in pertinent part:

> No common law or statutory right to recover damages from the employer ... for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act.

820 ILCS 305/5(a). Unless an exception applies, the exclusive remedy in the cited IWCA provision shields an employer from

Thus, that conduct pertains exclusively to the discrimination claim and, therefore, is preempted and thus should not be considered with respect to the IIED claim. The Court expresses great doubt as to whether two instances of hand slapping can qualify as "extreme and outrageous" conduct that "goes beyond all possible bounds of decency" such that it could support an IIED judgment in Daulo's favor. *See Pub. Fin. Corp. v. Davis,* 66 Ill.2d 85, 4 Ill.Dec. 652, 654, 360 N.E.2d 765, 767 (1976).

liability for injuries to employees. Daulo relies solely on the "alter ego" exception to impose liability upon ComEd. Daulo claims that Stachelski was the alter ego of ComEd, thus, ComEd is liable for the conduct supporting his IIED claim.[24]

■ Neither the Seventh Circuit nor the Illinois state courts have provided much guidance as to when an individual will qualify as the alter ego of a company such that the IWCA will be disregarded and the employer will be held liable for the individual's intentional conduct. It is clear, however, that status as a "foreman, supervisor, or manager," by itself, will not suffice. *See Jablonski v. Multack,* 63 Ill.App.3d 908, 20 Ill.Dec. 715, 718, 380 N.E.2d 924, 927 (1978). Judge Rovner's decision in *Crissman v. Healthco Int'l, Inc.,* No. 89 C 8298, 1992 WL 223820 (N.D.Ill. Sept. 2, 1992), is instructive. Judge Rovner noted that the individual must "in a practical sense, speak[ ] for the company." *Id.* at *9. In other words, the managerial employee should possess "the authority to make decisions and set policy on behalf of" the employer. *Id.*

Although, the precise confines of the alter ego analysis are uncertain, the Court agrees with Judge Rovner's position. Here, as discussed in the Court's analysis of whether Stachelski could be deemed ComEd for purposes of imposing Title VII liability upon ComEd, Stachelski was nothing more than the lowest level supervisor in ComEd's managerial hierarchy. He had the authority to do nothing more than provide informal warnings and evaluations of employees on his shift—a power inherent to virtually every supervisory position. Stachelski did not have the power to hire, fire, promote, or demote. He certainly lacked the power to make meaningful decisions or set policy for ComEd. Accordingly, in a practical sense, when it came to "speaking" for ComEd, not even a whimper came from Stachelski's mouth.

### III. *CONCLUSION*

For the foregoing reasons, ComEd and Cook's motion for summary judgment and Stachelski's motion to dismiss the IIED count for lack of jurisdiction are granted. Based on the Court's analysis, the only remaining count in this action is a § 1981 racial harassment claim against Stachelski.

---

**24.** Apparently, Daulo also claims that Cook was the alter ego of ComEd. But, Daulo does not cite to any conduct on the part of Cook in support of his IIED claim. He focuses only on the conduct of Stachelski.