Vincent J. KROCKA, Plaintiff,

v.

Patricia RIEGLER, Richard Wedgbury, James Bransfield, Bradford Woods, Steven J. Stanard, Matt Rodriguez, Stanard & Associates, Inc., and the City of Chicago, an Illinois Municipal Corporation, Defendants.

No. 95 C 627.

United States District Court, N.D. Illinois, Eastern District.

March 21, 1997.

James Michael Chesloe, Willow Springs, IL, Terrance Anthony Norton, IIT–Kent Law Offices, Chicago, IL, for Vincent J. Krocka.

Thaddeus S. Machnik, Eileen B. Libby, Shelly Rachel Remen, City of Chicago, Law Dept. Corp. Counsel, Chicago, IL, Susan S. Sher, Corp. Counsel, City of Chicago, Chicago, IL, for Patricia Riegler, Richard Wedgbury, James J. Bransfield, Bradford L. Woods, Dr. Steven J. Stanard, Matt Rodriguez, Stanard & Associates, Inc.

Thaddeus S. Machnik, Eileen B. Libby, City of Chicago, Law Dept. Corp. Counsel, Chicago, IL, Naomi Ann Avendano, City of Chicago, Law Dept., Chicago, IL, Susan S. Sher, Corp. Counsel City of Chicago, Chicago, IL, for City of Chicago.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Vincent J. Krocka brings this action under Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111 et seq., and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, to remedy allegedly unlawful employment practices and discrimination on the basis of disability. In addition, Krocka brings a claim pursuant to 42 U.S.C. § 1983 for deprivation of constitutional rights and claims pursuant to state common law. Defendants now move to dismiss the complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and to strike certain portions of the complaint.

### I. STATEMENT OF FACTS

Under Rule 12(b)(6), the court must accept as true all factual allegations of the complaint and draw all reasonable inferences in favor of the plaintiff. *Powe v. City of Chicago,* 664 F.2d 639, 642 (7th Cir.1981). The lengthy and detailed complaint contains allegations regarding the following sequence of events. Plaintiff Vincent J. Krocka ("Krocka") is a Chicago Police Officer in the 16th District who suffers from an endogenous form of depression. Krocka is also a licensed attorney in Illinois, Washington, D.C. and Florida. Defendants are the City of Chicago ("City"), Stanard & Associates, Inc. (a firm retained by the City to perform psychological evaluations) and various individuals employed by or otherwise associated with the Chicago Police Department ("CPD").

Krocka was hired by the CPD on January 28, 1980. In July 1990, his internist, Dr. Glenn Cabin, diagnosed him with hypertension. In October 1990, Dr. Michael Bresler diagnosed Krocka as suffering from a dysthymic disorder that resulted in symptoms of depression, including a sleep disorder, low self-esteem, sad affect, irritability and pessimism. A dysthymic disorder is endogenous, which means that it is physiologically or biologically based. Pursuant to this diagnosis, Dr. Cabin prescribed 20 mg per day of the medication Prozac. Without this medication, Krocka's depression makes it nearly impossible for him to get out of bed for most of the day, which significantly restricted his ability to carry out his duties as a police officer or lawyer to the point of seriously limiting or eliminating his ability to work. Within weeks of beginning treatment with Prozac, Krocka's condition improved significantly. For the first eight to ten months of treatment, Dr. Bresler evaluated Krocka's condition weekly, but in August 1991, Drs. Cabin and Bresler agreed that the evaluations could be reduced to once every three months. According to both doctors, treatment with Prozac significantly reduced Krocka's depression symptoms without impairing his cognitive skills, reaction time, driving skills, or general performance or ability, and allowed Krocka to carry out his duties as a police officer without impediment.

On November 29, 1992, Krocka fell down a flight of stairs while on duty, which rendered him unconscious and injured his head and neck. Because of those injuries, Krocka was placed on Medical Roll until December 7, 1992. On December 8, 1992, Krocka reported to the Medical Services Section of the CPD and disclosed that he was taking the following medications: Calan for blood pressure, Mevecor for cholesterol levels and Prozac for depression. At that time, Krocka was released to return to duty.

On January 7, 1993, Krocka returned to work after a vacation and was told to report the next day to defendant James Bransfield, Chief Surgeon of the CPD. At that meeting, the first question Bransfield asked was, "Are you still taking the Prozac?" When Krocka indicated that he was, Bransfield responded, "Oh no, Oh God. You know we're going to have to put you on medical." Upon learning that Krocka was a licensed attorney, Bransfield responded, "Oh no, Oh God." Bransfield placed Krocka on Medical Roll and also ordered him to submit to a physical exam and psychological evaluation. That day, Krocka had the physical exam, which found his health to be "essentially normal" except for an abnormal EKG and high blood pressure.

On January 25, 1993, Krocka was given a psychological exam by a staff member at Stanard & Associates. The resulting evaluation stated that Krocka was not referred for disciplinary reasons but because he "disclosed to the Department that he was taking Prozac." The evaluation also stated that Krocka was "a man who sought treatment for a depressive condition, and has experienced considerable relief through psychotherapy and the use of Prozac." On February 9, 1993, Dr. Cabin sent a letter to Bransfield that Krocka was being closely monitored by both Dr. Cabin and Dr. Bresler, and that while on Prozac, Krocka was able to fully perform his duties as a police officer.

On February 10, 1993, defendant Steven J. Stanard stated in a letter to defendant Richard Wedgbury, Director of Personnel for the CPD, that based on the information in Dr. Cabin's letter, Krocka should return to full active duty. He further recommended, however, that Krocka be placed in the Personnel Concerns Program for the duration of his treatment with Prozac. On the same day, defendant Bradford Woods, the Personnel Concerns Program Manager, started a Personnel Concerns Program log on Krocka with the notation that the log was "Per Steven Stanard Psych request 12 mos." On February 23, 1993, Krocka was returned to full active duty. Prior to placing Krocka in the Personnel Concerns Program, the City performed no test to determine whether he was a direct threat to the health or safety of others as a result of his treatment with Prozac.

On May 26, 1993, Woods sent an internal memorandum to Wedgbury requesting that Krocka be placed in Personnel Concerns based on Stanard's recommendation. Under the heading "Recent Disciplinary History," Woods typed "None." Woods recommended that Krocka be placed in Personnel Concerns although he knew that Krocka did not meet the criteria for placement in the program. Wedgbury approved Krocka's designation as a "Personnel Concern."

On June 21, 1993, a Personnel Concerns Conference took place at the 16th District to place Krocka into the Personnel Concerns Program. The conference was attended by, among others, Krocka, Woods and defendant Patricia Riegler, a Sergeant in the 16th District who was a Personnel Concerns Supervisor. At that time, Krocka was informed that his placement in the program was effective March 1, 1993, through March 1, 1994. Sixteenth District Commander Bergamin was not present at the conference even though program rules required his attendance. Commander Bergamin has since stated that as Krocka was not a disciplinary problem, he fails to see why Krocka was placed in the Personnel Concerns Program, considering its disciplinary criteria.

The Personnel Concerns Program requires all police divisions and departments to monitor officers and review their records for "unacceptable pattern[s] of behavior." These unacceptable behaviors, called Behavioral Alert Indicators, are: (1) excessive force, (2) complaint/disciplinary history, (3) repeated Medical Roll use, (4) repeated minor trans-

gressions in a 12–month period, (5) significant reduction in performance, (6) poor traffic safety record and (7) significant deviations from an officer's normal behavior. Krocka alleges that his treatment with Prozac does not fall under any of the Behavior Alert Indicators. Under the Personnel Concerns Program, a "Personnel Concern" is a person who has "not responded to routine corrective action or the increased supervisory attention that results from Behavioral Alert System Indicators." In Krocka's case, the defendants bypassed the many administrative steps required to effect Krocka's placement into the program.

A "Personnel Concerns Supervisor" is defined as a "specially trained supervisor who has the responsibility to closely monitor, evaluate, guide and improve the performance of an assigned personnel concern." According to Commander Bergamin, this special training consists of a one-day training session. On June 21, 1993, Riegler was assigned as Krocka's Personnel Concerns Supervisor. According to Krocka's complaint, Riegler was not adequately trained to make the psychological or medical evaluations required in monitoring individuals being treated with psychotropic medication. Krocka alleges that prior to being assigned as Krocka's Personnel Concerns Supervisor, Riegler had taken a leave of absence due to a "stress disorder," and at some time had threatened suicide or to cut her wrists.

The disciplinary nature of the Personnel Concerns Program makes placement in it highly stigmatizing within the CPD. It was common knowledge within the 16th District that Krocka was a Personnel Concern because of his Prozac treatment, and as a result Krocka became the butt of Prozac jokes and writings on the bathroom wall. Because a Personnel Concern draws scrutiny from supervisors, other police officers did not want to work with Krocka for fear of intense observation. On at least one occasion, Riegler told another officer that Krocka was "a nut case."

On August 7, 1993, Riegler was the Sergeant assigned to evaluate Krocka for his semi-annual efficiency rating. Although Krocka had previously received a rating of 85, Riegler tried to rate Krocka in the low 60s for abuse of the Medical Roll. However, as Bransfield had ordered Krocka's most recent medical leave, Riegler's rating was overruled after Krocka submitted a grievance. Krocka asserts that this event was the first in a lengthy series of attempts to manufacture a linkage between Krocka and Behavioral Alert Indicators in order to justify his retention in the Personnel Concerns Program, with the intended goal being Krocka's eventual removal from the police force because of his Prozac use.

In October 1993, Riegler began intensive supervision of Krocka, appearing constantly at jobs, following him on duty and monitoring him during personal and meal times. During the fall of 1993, Dr. Bresler was required to increase Krocka's appointment schedule from every three months to every two to three weeks. Dr. Bresler noted that Krocka felt increasingly anxious because of his placement in Personnel Concerns and had expressed concerns about the harassment he had endured. During this time, Riegler refused to allow Krocka to see the Personnel Concerns Progress Reports about him.

Prior to the time that Krocka requested an accommodation with regard to a new shift assignment, all of Riegler's Personnel Concerns Reports about him noted "no unusual behavior" and cited no code infractions or admonishments. In mid-December 1993, Krocka, as a result of the shift-bidding process, was assigned to work the 1st Watch (12:00 a.m. to 8:00 a.m.). For approximately the previous ten years, Krocka had been assigned to the 3rd Watch (4:00 p.m. to 12:00 a.m.). At about this time, Dr. Cabin wrote to Bransfield and requested that Krocka be accommodated on the 3rd Watch for health reasons. On December 27, 1993, Krocka met with Bransfield, who commented that only diabetics were allowed shift accommodations because of their medication schedules. He refused to honor Dr. Cabin's request.

On January 27, 1994, Riegler wrote her first Personnel Concerns Report on Krocka since his request for shift change. In it she criticized Krocka for "poor production" and noted that he would be kept on 3rd Watch

until his term in Personnel Concerns was concluded. The following day, Riegler called Krocka in for a "counselling session" and admonished him for an alleged uniform violation, another alleged infraction and tardiness. On February 2, 1994, Riegler issued another semi-annual evaluation of Krocka, lowering his efficiency rating from 84 to 82 and noting that Krocka "[n]eed[ed] more than normal supervision."

On the same day, Krocka entered a 7–11 store at Irving and Central. Three other officers entered shortly thereafter. After making a purchase, Krocka left the store. Riegler witnessed these events. That night, at the 16th District and in front of police desk personnel and midnight shift supervisors, Riegler orally reprimanded the other three officers, but selectively singled out Krocka and initiated a Summary Action Punishment Request against him for "inattention to duty." Riegler further threatened, "the next time, it'll be days." On February 3, 1994, Krocka was informed by Commander Bergamin that he had received a call from Woods, and informed Krocka that he either had to work the 1st Watch or go on Medical Roll. He also told Krocka that he would remain in Personnel Concerns as long as his Prozac treatment continued.

On February 4, 1994, Krocka felt ill while on duty. Krocka's partner took him to Resurrection Hospital, where he was admitted and diagnosed as having a cardiovascular attack, angina, an irregular heartbeat and severely acute hypertension. An emergency room nurse informed Krocka that he had almost suffered a stroke. Krocka was hospitalized for six days in the Coronary Care Unit as a result of this attack, and the bill for his stay and follow-up medical services totaled $16,348. Additional fees for psychological consultation since the fall of 1993 totaled $1,000. Krocka was released into the care of Dr. Cabin and placed on Medical Roll. Krocka asserts that this cardiovascular attack was the result of continuous employment stress generated by defendants' conduct, harassment and retaliation for Krocka's attempt to seek a reasonable accommodation on account of his disability.

On February 17, 1994, Dr. Cabin wrote to Bransfield and informed him that Krocka was being "closely monitored" in regularly scheduled exams, which consisted of blood workups, blood pressure, EKG readings and lengthy discussions about how Krocka was responding to Prozac treatment. On March 1, 1994, Krocka met with Bransfield, who ordered Krocka to submit to a blood test to measure the level of Prozac in his system. Krocka did not voluntarily submit to the blood test and objected to Bransfield's order. Bransfield responded by informing Krocka that he was in violation of a direct order and threatening him with disciplinary action if he did not comply. On March 10, 1994, Krocka underwent the blood test at Dr. Cabin's office. Dr. Cabin informed Krocka that the test was unnecessary and had no therapeutic value as treatment for Krocka's dysthymic disorder.

On March 15, 1994, Krocka again met with Bransfield and gave Bransfield another letter from Dr. Cabin requesting that Krocka be returned to limited duty with non-stressful activity on the 3rd Watch. Bransfield refused to accommodate the request on the grounds that he had yet to receive the blood test results. On March 25, 1994, those test results arrived and indicated that Krocka's Prozac level was well below reference range. In light of those results, Krocka wrote to Woods and inquired about his status as a "personnel concern." Woods responded on April 8, 1994, informing Krocka that it was the policy of Wedgbury and Bransfield to keep Krocka in Personnel Concerns as long as Krocka continued Prozac treatment. Krocka asserts that this policy was deliberately designed to discriminate against him and effect his eventual removal from the police force because of his Prozac use.

On April 15, 1994, Krocka filed a charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC") based on the defendants' conduct. On April 25, 1994, he filed a complaint in the Circuit Court of Cook County against Riegler, Wedgbury, Bransfield, Rodriguez and the City, alleging slander, intentional infliction of emotional distress and handicap dis-

crimination under the Illinois Human Rights Act.

On May 9, 1994, Krocka met with Bransfield, who at that time removed Krocka from Medical Roll and placed him on limited duty. At the 16th District, Commander Bergamin assigned Krocka to limited duty at Our Lady of the Resurrection Hospital. On June 30, 1994, a Complaint Register was issued against Krocka based on an anonymous tip alleging that Krocka appeared as an attorney at a court hearing while on Medical Roll. The tip was allegedly provided to Internal Affairs by an agent or employee of the City who had access to Krocka's Medical Services file and had investigated his attorney schedule. On July 19, 1994, Krocka filed an additional charge with the EEOC, alleging that the above Complaint Register was initiated in retaliation for the filing of Krocka's state court complaint.

On August 1, 1994, Sergeant Wenger conducted Krocka's semiannual efficiency rating. Wenger raised the rating Riegler had given Krocka and noted that he "[r]equire[d] little or no supervision." In September 1994, while Commander Bergamin was on vacation, Krocka was removed from his post at Resurrection Hospital and assigned to the downtown Communications Department to answer 911 emergency calls, which was a more stressful assignment. Krocka asserts that this transfer was in violation of Dr. Cabin's orders and in retaliation for Krocka's attempts to pursue his rights against discrimination. On September 20, 1994, Dr. Cabin saw Krocka and noted that he had suffered a relapse of his hypertension from his placement in the Communications Department. On October 3, 1994, Dr. Cabin wrote to the City and stated that Krocka was fit to return to full active duty at the 16th District if he remained on the 3rd Watch. In October 1994, Krocka was returned to full active duty, although his official assignment remains on the 1st Watch. At the time Krocka filed the complaint, he was still classified as a Personnel Concern in the Personnel Concerns Program and had not yet received official notice from the City that his request for an accommodation assignment to the 3rd Watch had been granted.

## II. DISCUSSION

### A. THE ADA CLAIM

In Count I, Krocka maintains that defendants have engaged in various employment practices that constitute discrimination on the basis of a disability in violation of the ADA, including: his classification as a Personnel Concern, his placement in the Personnel Concerns Program, his forced submission to medical testing, defendants' alleged failure to provide plaintiff with a reasonable accommodation for his disability, and their retaliation against him for requesting an accommodation and for pursuing his rights under the ADA.[1]

Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." All that a complaint must do is provide notice of the claim by advising the defendant of the event being sued on. *Daniels v. USS Agri–Chemicals*, 965 F.2d 376, 381 (7th Cir.1992). The question for the court under Rule 12(b)(6) is whether relief is possible under any set of facts that could be established consistent with the allegations. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to … [the individual's] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Defendants argue that Krocka has failed to state a claim for relief under the ADA because his depression does not qualify as a "disability" under the ADA.

The ADA defines a "disability" as:

1. Plaintiff has voluntarily withdrawn his claims under the ADA and 42 U.S.C. § 1981a against the individual defendants, citing the Seventh Circuit's ruling in *EEOC v. AIC Security Investi-* gations, *Ltd.*, 55 F.3d 1276 (7th Cir.1995). Therefore, Count I is dismissed as to Riegler, Wedgbury, Bransfield, Woods, Stanard and Rodriguez.

(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). According to defendants, plaintiff alleges "that at the time of his diagnosis, he was prescribed Prozac and, as a result of this medication, 'the detrimental symptoms of his depression' were alleviated, thus allowing him to perform fully all the essential functions of his position as police officer." Defendants argue that because the complaint alleges that Krocka is qualified to perform his duties as a police officer and also as an attorney, it necessarily fails to allege that he is "disabled."

Defendants misconceive the nature of the ADA. The entire thrust of the ADA is to prohibit discrimination against those individuals with disabilities who *are* qualified to perform the essential functions of their job with or without reasonable accommodation. *See* 42 U.S.C. § 12111(7). The fact that Krocka alleges that he is able to perform his duties as a police officer as long as he takes Prozac does not imply that he does not suffer a substantial impairment of a major life activity; therefore, it does not mean that he is not "disabled" within the meaning of the ADA. The condition at issue is to be considered "without regard to mitigating measures such as medicine." Interpretive Appendix § 1630.2(h).[2] Therefore, defendants' focus on plaintiff's performance when he is taking medication is improper. Any mental or psychological disorder, including emotional or mental illness, is considered a "mental impairment" under the ADA. 29 CFR § 1630.2(h)(2). Depression is among the mental impairments that may rise to the level of a protected disability. *"Doe" v. Marshall,* 882 F.Supp. 1504, 1507 n. 3 (E.D.Pa. 1995); *Stradley v. Lafourche Communications, Inc.,* 869 F.Supp. 442, 443 (E.D.La. 1994).

Additionally, defendants contend that the complaint fails to state that even without treatment or medication, Krocka's depression substantially limits a major life activity because the inability to perform one job or work a particular shift does not affect a person's ability to work to the degree that constitutes a disability. For an impairment to be a protected disability under the ADA, it must substantially limit one or more "major life activities," a term that includes caring for one's self, performing manual tasks, walking, seeing, speaking, breathing, learning and working. 42 U.S.C. § 12102(2)(A); 29 CFR § 1630.2(g), (i). Defendants' assert that plaintiff's disability only prevented him from working the 1st Watch or other particularly stressful assignments and that this does not "substantially limit" his ability to work because other positions or jobs remain available. *See Roth v. Lutheran General Hospital,* 57 F.3d 1446, 1454. In *Roth,* the plaintiff had visual conditions that made him susceptible to eye strain and fatigue more quickly than a person with normal eyesight. He applied to a medical residency program, requesting a particular shift and shorter hours as a reasonable accommodation. The court held that although the plaintiff alleged that he was substantially limited in "seeing and learning," his visual conditions did not constitute a disability because a variety of other positions—including residency programs that did not have a 36–hour on-call requirement—were still available to him. *Id.* at 1454–55. In addition, the plaintiff had previously been successful in a number of demanding positions without accommodation, and the court found that the plaintiff's assertion that he could not work for more than eight hours a day was not credible. *Id.*

The court disagrees with defendants' comparison of *Roth* to the facts as alleged in this case, and with their conclusion that the complaint alleges only that Krocka's depression prevents him from performing one job or shift. According to the complaint, Krocka's depression does substantially limit a major life activity. Krocka stated that without Prozac, his ability to get out of bed—and as a result to work and to care for himself—is

---

**2.** The EEOC interpretation gives an analogous example. It states: "For example, an individual with epilepsy would be considered to have an impairment even if the symptoms of the disorder were completely controlled by medicine." Interpretive Appendix, 29 CFR § 1630.2(h).

substantially limited by his depression. Although defendants contend that Krocka is a licensed attorney and can perform his duties as a police officer, the allegations in the complaint indicate that without medication and treatment, Krocka's depression would render him unable to perform these positions and their duties. At this stage, the court cannot find that the allegations in the complaint preclude a finding that Krocka suffers from a mental impairment that substantially limits a major life activity and qualifies as a "disability" for purposes of the ADA.

■ Even though Krocka's depression constitutes a "disability" within the meaning of the ADA, defendants argue that Krocka has failed to state a claim that he was discriminated against based on his depression. Specifically, defendants argue that Krocka's placement in the Personnel Concerns Program did not violate the ADA. According to defendants, one of the Behavioral Alert Indicators that may lead the CPD to place an officer in the Program is when there has been a "significant deviation from the officer's normal behavior." Defendants maintain that Krocka exhibited such a behavioral deviation when he began using Prozac and fell down a flight of stairs on November 29, 1992.

The ADA identifies a variety of prohibited employment practices that it defines as "discrimination" against an employee with a disability. These include limiting, segregating or classifying an individual because of his or her disability in a way that adversely affects job opportunities or status. 42 U.S.C. § 12112(b). Krocka's complaint asserts a variety of separate incidents that, at least on their face, constitute "discrimination" under this definition. First, Krocka asserts that he was placed in the Personnel Concerns Program because he was taking Prozac, and that as a result of being classified as a Personnel Concern, he was subjected to intensive scrutiny on the job that led to other officers refusing to work with him.

It is clear that placement in the Personnel Concerns Program, with its attendant close supervision and stigmatization, tends to "limit[ ], segregat[e], or classifi[y]" an employee "in a way that adversely affects the opportu-nities or status of [the] employee." On the other hand, the Program is designed to assist employees with behavioral problems so that they can continue to work. While it is possible that "segregating" an employee in the PCP—which could adversely affect the employee's status—might result from a condition qualifying as a disability, it would be ironic if the ADA were interpreted to make employers liable for taking steps to help employees suffering from behavioral problems. Regardless, this potential quandary does not arise in this case because the court understands Krocka's position to be that while there is nothing inherently wrong with placing someone with behavioral problems in the Program, Krocka did not have behavioral problems warranting such placement. He argues that the only reason he was placed in the Program was his disability and that, considering the negative connotations associated with being placed in the Behavioral Concerns Program, using it as a program to monitor officers' disabilities could clearly constitute impermissible limitation, segregation or classification based on disability.

Defendants argue, of course, that Krocka was an appropriate candidate for the Program because of his Prozac use and his fall down the stairs. It is certainly not clear at this stage, as defendants claim, that these constitute "significant deviations" from an officer's "normal behavior" as used in the CPD standards. Krocka asserts that his Prozac use had no connection to the fall and that he had been taking Prozac for two years before the CPD learned that it had been prescribed for him. The court concludes that Krocka has stated a claim for discrimination under the ADA. The court cannot say that Krocka could prove no set of facts that would enable him to prevail on his claim that his placement in the Program was inconsistent with CPD standards and motivated by impermissible attitudes toward his disability.

■ Defendants also argue that Count I should be dismissed because Krocka has failed to plead that he was denied a "reasonable accommodation." Failure to make a "reasonable accommodation" is one of the discriminatory employment practices prohibited by the ADA. *See* 42 U.S.C.

§ 12112(b)(5)(A). In his response, Krocka suggests that defendants failed to make a reasonable accommodation by refusing to place him on limited duty following his heart attack, reassigning him to the more stressful 911 post answering emergency calls, and failing to provide him with official notification granting his request for assignment to the 3rd Watch. Defendants respond by pointing out that Krocka was given limited duty posts—one at Our Lady of the Resurrection Hospital and one at the Communications Department answering 911 calls. Defendants also point out that Krocka has since been returned to his preferred assignment, the 3rd Watch.

Initially, the court notes that defendants' alleged failure to provide Krocka with a reasonable accommodation is just one of the allegedly discriminatory employment practices mentioned in the complaint. Krocka also alleges that defendants discriminated against him by: placing him in the Program, making him take medical tests, and retaliating against him for opposing acts made unlawful by the ADA and for requesting a reasonable accommodation. Even if Krocka failed to plead that defendants had not provided him with a reasonable accommodation, that would not entitle defendants to dismissal of Count I in its entirety. *See Vande Zande v. State of Wisconsin Dept. of Admin.*, 44 F.3d 538, 541–42 (7th Cir.1995) (noting that some but not all ADA claims were based on failure to provide a "reasonable accommodation").

The complaint contains the following allegations as to the failure to provide a reasonable accommodation. In mid December 1993, Krocka was randomly assigned the 1st Watch (12:00 a.m. to 8 a.m.), after having worked the 3rd Watch (4:00 p.m. to 12:00 a.m.) for the previous ten years. Dr. Cabin subsequently wrote a letter to Bransfield requesting that Krocka be reassigned to the 3rd Watch for health reasons. On December 27, 1993, Bransfield told Krocka that only diabetics were allowed shift accommodations because of their medication schedules and he refused to assign Krocka to the requested shift. In April 1994, Krocka initiated litigation concerning his claim of discrimination. On May 9, 1994, Bransfield placed Krocka on limited duty and assigned him to Our Lady of the Resurrection Hospital. In September 1994, Krocka was placed in a more stressful environment in the Communications Department answering emergency 911 calls. In October, after Dr. Cabin requested that Krocka be reassigned to the 3rd Watch, Krocka was returned to that assignment.

Therefore, although Krocka was working his preferred assignment at the time he filed the complaint, it appears that he was denied this assignment for eight months. Defendants argue that such a delay was not unreasonable "in a large metropolitan police department, where personnel scheduling and coverage are complex and critical to operations." However, defendants' assertion that the delay was simply caused by the scheduling problems is belied by the fact that Bransfield refused outright the requested shift accommodation. Thus, according to the allegations of the complaint, the delay was not caused by the complexity of scheduling problems but because only diabetics were permitted shift accommodations. It was not until after Krocka initiated litigation that he was relieved from working the 1st Watch. Even then, he was not placed on the 3rd Watch, where he had been working for the past 10 years. According to the complaint, it was not until October 1994 that he finally received that assignment.

Without determining whether the particular accommodations were required in this case, the court finds that an unreasonable delay in implementing a "reasonable accommodation" can constitute a discriminatory act. This is especially true when, as is alleged here, the employer initially refused outright to consider any accommodation for that particular disability. 42 U.S.C. § 12112(b)(5). The court cannot say that the eight-month delay was, under the circumstances of this case, a reasonable delay as a matter of law. Thus, defendants' motion to dismiss Count I for failure to plead that Krocka was denied a "reasonable accommodation" is denied.

■ Count I will be dismissed against Stanard & Associates because Krocka failed to name it in his EEOC charge. *See Perkins v.*

*Silverstein,* 939 F.2d 463, 470 (7th Cir.1991). Ordinarily, a plaintiff must name a defendant in his EEOC charge in order to sue the defendant in federal court. *See Perkins,* 939 F.2d at 470. Krocka failed to name certain of the defendants, including Standard & Associates, and does not fall within the exception to the rule that permits parties not named in the EEOC charge to be named as defendants in a subsequent lawsuit because they were "sufficiently named or alluded to in the factual statement of an EEOC charge." *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 906 (7th Cir.1981). Stanard & Associates was mentioned only once in passing in an affidavit supposedly submitted with the EEOC charge. Moreover, unlike the situation in *Eggleston,* there is no indication that the notice that was given to any of the parties who *were* named in the EEOC charge was sufficient to give notice to Stanard & Associates.

## B. THE § 1983 CLAIM

Count II of the plaintiff's complaint alleges that defendant Bransfield, in his individual capacity as Chief Surgeon of the Chicago Police Department, deprived Krocka of his Fourth Amendment right to be secure from "unreasonable searches and seizures" by ordering Krocka to undergo a mandatory blood test to determine the level of Prozac in his system. Bransfield moves to dismiss this count, arguing that the mandatory blood test was reasonable, noninvasive and undertaken with probable cause. Therefore, he argues, it was not a deprivation of Krocka's Fourth Amendment rights.[3]

As an initial matter, the court rejects defendants' argument that the case does not implicate the Fourth Amendment at all because Bransfield did not conduct the blood test himself and it took place at the office of plaintiff's own physician. According to the Supreme Court, "it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable." *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602, 616, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989). Bransfield ordered plaintiff to undergo the blood test and submit the results. The question is whether this order was reasonable, which " 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.' " *Id.* at 619, 109 S.Ct. at 1414 (quoting *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985)). Because the blood test was not ordered to serve the needs of law enforcement by collecting evidence of a crime, the reasonableness of the search is determined by "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " *Id.* (quoting *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)); *see also National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665–66, 109 S.Ct. 1384, 1390–91, 103 L.Ed.2d 685 (1989).[4]

In the instant case, it is clear the City has a legitimate interest in ensuring that its police officers are both emotionally and men-

---

**3.** Bransfield has moved to strike ¶¶ 35–39 of the complaint because they are time-barred by the two-year statute of limitations governing § 1983 claims. Plaintiff's response is that he included those paragraphs, which recount Bransfield's reaction to the information that Krocka was taking Prozac and his placing Krocka on the medical roll, simply as background material. He asserts that the gravamen of his claim against Bransfield is the order that plaintiff submit to a blood test to determine the level of Prozac in his system. Bransfield does not dispute that this order occurred within the two-year limitations period. The court therefore denies the motion to strike the cited paragraphs of the complaint.

**4.** Because the search in this case was not conducted for the ordinary purposes of law enforce-

ment, the traditional probable-cause standard is unhelpful in analyzing the reasonableness of the search. *See Von Raab,* 489 U.S. at 668, 109 S.Ct. at 1392. Thus, Bransfield's argument that he had "probable cause" to order the blood test because plaintiff had suffered a fall while on duty and had reported that he was taking three separate medications, including Prozac, is irrelevant. In any event, the court notes that although the fall occurred in November 1992, Bransfield did not order the blood test until March 1994, approximately 16 months later. If he truly believed that Krocka's use of Prozac posed a threat to public safety, it is unlikely he would have waited so long to order the test.

tally fit to perform their duties. *See Von Raab*, 489 U.S. at 670, 109 S.Ct. at 1393. It is also clear from the cases that an individual has a legitimate privacy interest in not being compelled to submit to a physical intrusion such as a blood test. To determine whether Krocka has stated a claim for a Fourth Amendment violation, these interests must be balanced. The complaint alleges that in October 1990, Krocka was diagnosed as suffering from a dysthymic disorder, resulting in symptoms of depression, feelings of low self esteem, sad affect, irritability and pessimism. It further alleges that, without medication, Krocka's condition made it nearly impossible for him to work. However, after taking Prozac—a legally prescribed medication—his condition improved greatly. The treatment with Prozac reportedly eliminated the detrimental symptoms of Krocka's depression without impairing his cognitive abilities, reaction time, driving skills or general performance and ability, and allowed him to fully perform his duties as a police officer. On the other hand, the City claims that it has a legitimate interest in ensuring that its officers are "emotionally and psychologically fit for duty." It cites cases holding that government tests for illegal drugs or alcohol do not violate the Fourth Amendment because they were justified by national security and safety concerns. *Von Raab*, 489 U.S. at 676, 109 S.Ct. at 1396; *Skinner*, 489 U.S. at 628, 109 S.Ct. at 1419.

In light of the facts as alleged, Krocka has stated a claim for the violation of his Fourth Amendment rights. According to the complaint, the City's safety concerns about Krocka arising from his use of Prozac are essentially nonexistent. There is no indication that testing the level of Prozac in Krocka's blood would have provided the CPD with any information that he was a danger to himself or the public. On the other hand, Krocka has a substantial privacy interest in his bodily integrity. On the facts alleged, Krocka's privacy interests outweigh the City's safety concerns. *Skinner* and *Von Raab* are distinguishable because, in those cases, the government's measures actually advanced its legitimate interest in public safety because the tests were for illegal drugs or alcohol, which affected performance or behavior. In con-

trast, when viewing the facts in the light most favorable to Krocka, Bransfield's testing of Krocka for the level of Prozac in his system did nothing to advance the City's legitimate interest in public safety. Thus, the complaint states a claim that Bransfield violated Krocka's Fourth Amendment rights.

■ Bransfield argues that, even if the complaint states a claim for a violation of Krocka's Fourth Amendment rights, he is qualifiedly immune from liability. Although more often raised at the summary judgment stage, the qualified immunity defense may be raised at the 12(b)(6) stage. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1175 (7th Cir.1994). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from civil damages insofar. as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.*

Krocka bears the burden of establishing that the constitutional or statutory right allegedly violated was clearly established at the time Bransfield acted. *Lawshe v. Simpson*, 16 F.3d 1475, 1483 (7th Cir.1994). This requires Krocka to offer a closely analogous case or evidence that Bransfield's conduct was so patently violative of the constitutional right in question that reasonable officials would know without guidance from the courts. *Id.*

Krocka has offered no closely analogous case demonstrating that Bransfield's conduct was unlawful. Instead, he argues that prior to the blood test, "federal statutory law clearly established ... that it was unlawful to require a medical examination and to make inquiries 'as to the nature and severity of the disability'" (citing 42 U.S.C. § 12112(d)(4)(A)). In other words, to defeat Bransfield's qualified immunity defense to the Fourth Amendment claim, Krocka argues that Bransfield violated the ADA—clearly

established statutory law of which a reasonable person would have known. This argument fails. A government official does not lose his immunity "by violating the clear command of a statute or regulation—of federal or state law—unless that statute or regulation provides the basis of the cause of action sued upon." *Davis v. Scherer,* 468 U.S. 183, 195 n. 12, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984); *see also Elder v. Holloway,* 510 U.S. 510, 515–16, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994) (explaining *Davis* ); *Triad Associates v. Robinson,* 10 F.3d 492, 499 n. 9 (7th Cir.1993). In this case, Bransfield is claiming qualified immunity with respect to the Fourth Amendment claim. Thus, even if Bransfield's conduct violated the clear command of the ADA, that does not strip him of his qualified immunity as to the Fourth Amendment claim.

■ Although he cannot cite an analogous case, Krocka also argues that at the time Bransfield acted, "the law was clearly established that the Fourth Amendment proscribes all searches and seizures which are *unreasonable.*" He cites *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), for the proposition that conducting bodily intrusions on the mere chance that evidence might be found is forbidden by the Fourth Amendment. He notes that the purpose of the blood test was to measure the level of a legally prescribed medication and that a forced blood test under such circumstances is clearly unreasonable. In effect, Krocka is arguing that Bransfield's conduct was so patently violative of his Fourth Amendment rights that a reasonable official would have known without guidance from the courts.

Bransfield responds by arguing that existing law permitted him to order the blood test. In essence, his argument is that his alleged actions did not violate the Fourth Amendment. However, the court has already determined that Krocka stated a claim for such a violation. The question is whether the law at the time was sufficiently clear that a reasonable official in Bransfield's position would have known that he was violating Krocka's rights. *See Anderson v. Creighton,*

483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

Given the facts that must be presumed true at this stage, the court concludes that the law was sufficiently clear that Bransfield should have known that ordering a blood test to measure levels of a legally prescribed drug was a violation of Krocka's Fourth Amendment rights. Although Krocka has not pointed to any case where a public official ordered an employee to undergo a blood test to measure the level of Prozac in the employee's system, this does not conclusively establish that Bransfield's conduct was objectively reasonable. The cases the parties do cite all involve tests for either illegal narcotics or alcohol. *See Von Raab,* 489 U.S. at 662, 109 S.Ct. at 1389 (urine testing for illegal narcotics); *Skinner,* 489 U.S. at 609–11, 109 S.Ct. at 1409–10 (blood, urine and breath tests for alcohol and illegal drugs); *Schmerber,* 384 U.S. at 758, 86 S.Ct. at 1829 (blood test for illegal level of alcohol). These tests are not comparable to the one ordered in this case because illegal narcotics or alcohol are capable of impairing one's judgment and testing for them is an effective means to advance the government's legitimate interest in safety. On the current record, there is no indication that Prozac, like alcohol or illegal narcotics, has the capacity to impair one's judgment. Although it affects the mind, it does so by alleviating depression. Rather than being evidence that Prozac *impairs* one's judgment, this appears to be evidence that Prozac helps return the mind to a normal state. The court is not disturbed by the lack of similar cases. An analogy would be ordering Krocka to undergo testing to determine the level of aspirin in his system. There is no case that holds that a blood test for aspirin violates an employee's Fourth Amendment rights but only because the violation would be so obvious. *Eberhardt v. O'Malley,* 17 F.3d 1023, 1028 (7th Cir.1994) (denying qualified immunity despite lack of similar case law because "[t]his is such an elementary violation of the First Amendment that the absence of a reported case with similar facts demonstrates nothing more than widespread compliance with well-recognized constitutional principles"); *K.H. Through Murphy v.*

*Morgan,* 914 F.2d 846, 851 (7th Cir.1990) ("The easiest cases don't even arise.").

The facts alleged in the complaint demonstrate that Bransfield had no legitimate safety concern with respect to the level of Prozac in Krocka's system. There was no evidence that Prozac caused Krocka to be dangerous to himself or others. Indeed, Bransfield, who is a doctor, had been informed twice by Krocka's doctors that Krocka was being closely monitored and that he was able to perform fully his duties as a police officer. Therefore, Bransfield had no reason to believe that he had a reasonable basis for monitoring the level of Prozac in Krocka's system. A mandatory blood test that fails to serve any governmental interest is violative of an individual's Fourth Amendment rights. The court concludes that, on the facts alleged in the complaint, Bransfield is not entitled to qualified immunity. Therefore, the court denies Bransfield's motion to dismiss Count II.

### C. THE STATE LAW CLAIMS

■ Counts III, IV and VII are Krocka's pendent state law claims.[5] Count III is a willful and wanton conduct claim against Riegler. Krocka alleges that Riegler's actions towards him were based on corrupt or malicious motives, and were taken deliberately and wilfully or with such gross negligence as to indicate a wanton and reckless disregard for Krocka's rights and safety. Count IV is a respondeat superior claim against the city for Riegler's alleged willful and wanton conduct, and Count VII is a claim for intentional infliction of emotional distress against Riegler, Wedgbury, Bransfield and the City.

Defendants have moved for dismissal of these state law claims for lack of subject matter jurisdiction pursuant to the Illinois Supreme Court's holding in *Geise v. The Phoenix Company of Chicago,* 159 Ill.2d 507, 203 Ill.Dec. 454, 639 N.E.2d 1273 (1994). Under Illinois law, when the allegations on which a state law tort is based constitute a civil rights violation under the Illinois Human Rights Act (IHRA), the tort is preempted. *Id.* Defendants assert that Krocka's state law claims are based solely on the allegations that defendants discriminated against Krocka based on his disability. Because such discrimination is prohibited by the IHRA, they claim that Krocka's claims are essentially ones for civil rights violations under the IHRA and should have been brought before the Illinois Human Rights Commission.

Courts in the Northern District of Illinois are "routinely" dismissing common law torts that are brought in conjunction with civil rights claims. *Daulo v. Commonwealth Edison,* 938 F.Supp. 1388, 1404 (N.D.Ill.1996). This court has previously addressed this issue as to the tort of intentional infliction of emotional distress, holding that it was preempted. *Stahnke v. LMLM Inc.,* 1996 WL 48610 (N.D.Ill.). "When determining if the state claim ... is 'inextricably linked' to the discrimination claim, the courts generally look to whether the state claim could form an independent basis for imposing liability, absent the allegations of discrimination." *Daulo,* 938 F.Supp. at 1405.

Predictably, plaintiff's response is that the allegations in his state law claims are not "inextricably linked" to disability discrimination because he would have a cause of action whether or not he is disabled and whether or not defendants' actions toward him were motivated by his disability. The problem with this argument is that plaintiff has not separated the allegations in the complaint from his disability and instead has inextricably linked them to his depression or to his taking Prozac. As defendants point out, in each of his state law counts, plaintiff repeats and realleges each allegation that made up his ADA count. In fact, Count III contains no additional allegations. Although plaintiff provides additional information in Count VII, some of these allegations relate directly to plaintiff's disability. For example, he states that Riegler made disparaging comments to him about his hypertension and depression and that Bransfield based Krocka's placement in the Personnel Concerns Program solely on his taking Prozac. Plaintiff cannot separate his state law claims from his claims of discrimination based on disability. Because they are "inextricably linked," Geise preempts them. Accordingly, the defen-

---

**5.** Krocka has voluntarily dismissed the state law claims contained in Counts V and VI.

dants' motion to dismiss Counts III, IV and VII is granted.

ORDERED: Defendants' motion to dismiss is granted in part and denied in part: Defendants' motion to dismiss Count I is granted as to Riegler, Wedgbury, Bransfield, Woods, Rodriguez, Standard, and Stanard & Associates; and denied as to the City. Defendants' motion to dismiss Count II is denied; and the motion to dismiss Counts III, IV and VII is granted. Defendants Riegler, Wedgbury, Woods, Rodriguez, Standard, and Stanard & Associates are dismissed from the action. Remaining claims include the ADA claim against the City of Chicago, and the Fourth Amendment claim against Bransfield.